## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SHERRY GAINES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL WILDLIFE FEDERATION,<br><br>Defendant. | Case No. 5:22-cv-11173-JEL-CI<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sherry Gaines, individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      Defendant National Wildlife Federation ("NWF") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's purchases of *Ranger Rick* magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed her information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading Information

(defined below) during the relevant pre-July 31, 2016 time period[1], NWF violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.     Documented evidence confirms these facts. For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "Ranger Rick Masterfile with Enhancements Mailing List", which contains the Private Reading Information of all 651,679 of NWF's then-active and recently expired U.S. subscribers at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece), as shown in the screenshot below:

---

[1]     The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]     In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods*., 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 682-83 (W.D. Mich. 2018).



### Ranger Rick Masterfile with Enhancements Mailing List

This is a combined unduplicated masterfile of Ranger Rick, Ranger Rick Jr. and Ranger Rick Cub. Mailers can cut across the entire database or segment by subscribers, gift givers or expires. Through these childrens publications, kids learn all about animals, their habitats, and how to help endangered species and their environment. Ranger Rick is a magazine for children ages 7 and up. Published 10 times per year. Ranger Rick Jr. is a magazine for children ages 4-7. Published 10 times per year. Ranger Rick Cub is a magazine for children ages 0-4. Published 6 times per year.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 03/01/2022 |
|---|---|
| 651,679 TOTAL UNIVERSE / BASE RATE | $105.00/M |
| 159,148 3 MONTH SUBSCRIBERS/GIFT GIVERS | + $15.00/M |
| 365,230 6 MONTH SUBSCRIBERS/GIFT GIVERS | + $10.00/M |
| 546,566 12 MONTH SUBSCRIBERS/GIFT GIVERS | $105.00/M |
| 320,085 24 MONTH EXPIRES | $70.00/M |
| FUNDRAISING/NON-PROFIT RATE | $75.00/M |
| CATALOG RATE | $80.00/M |

| POPULARITY: | ••••• 100 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | 🖃 |
| SOURCE: | OTHER |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |

**DESCRIPTION**

This is a combined unduplicated masterfile of Ranger Rick, Ranger Rick Jr. and Ranger Rick Cub. Mailers can cut across the entire database or segment by subscribers, gift givers or expires. Through these children's publications, kids learn all about animals, their habitats, and how to help endangered species and their environment.

Ranger Rick is a magazine for children ages 7-12. Published 10 times a year.
Ranger Rick Jr. is a magazine for children ages 4-7. Published 10 times a year.

Ranger Rick Cub is a magazine for children ages 0-4. Published 6 times a year.

Ranger Rick masterfile SUBSCRIBER names are provided TITLE SLUGGED only, "To the ____ Family". GIFT GIVER names are provided TITLE SLUGGED AND FIRST NAME/LAST NAME.

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $20.00/M |
| 3 MONTH HOTLINE | $15.00/M |
| 6 MONTH HOTLINE | $10.00/M |
| ADDITIONAL COUNTS | |
| ADULT AGE | $12.00/M |
| CHILD AGE | $12.00/M |
| DEMOGRAPHIC | $12.00/M |
| ETHNICITY/RELIGION/POLITICAL | $17.00/M |
| GENDER/SEX | $10.00/M |
| HOMEOWNER | $12.00/M |
| INCOME | $12.00/M |
| LIFESTYLE | $17.00/M |
| MEMBERSHIP FLAG | $7.00/M |
| PAID | $10.00/M |
| SOURCE | $10.00/M |
| STATE, SCF, ZIP | $10.00/M |
| ADDRESSING | |
| KEY CODING | $2.00/M |
| EMAIL | $59.00/F |
| FTP | $59.00/F |

**RELATED LISTS**

- PARENTS MAGAZINE
- HEARTHSONG
- HIGHLIGHTS® "MAGAZINE" MASTERFILE
- YOUNG EXPLORERS
- EARLY MOMENTS BOOK CLUB MASTERFILE
- SMITHSONIAN MAGAZINE
- RANGER RICK SUBSCRIBERS
- HIGHLIGHTS® FAMILY MASTERFILE
- NATIONAL WILDLIFE FEDERATION MEMBER DONORS
- ONE STEP AHEAD CATALOG

*See* **Exhibit A** hereto. The same or a substantially similar "data card" as the one shown above, with the same rates and the same advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by NWF as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that NWF was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading

Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.

3.      Indeed, during relevant pre-July 31, 2016 time period, NextMark also offered to provide renters access to the mailing list titled "Ranger Rick Marketing Genetics Masterfile", which contains the Private Reading Information of all 753,350 of NWF's then-active and recently expired U.S. subscribers at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece).

4.      As a result of NWF's practices of disclosing their Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes following their purchases of subscriptions to NWT's publications over the same time period.

5.      By renting, exchanging, or otherwise disclosing the Private Reading Information of its entire database its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, NWF violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

4

6.     Accordingly, Plaintiff brings this First Amended Class Action Complaint against NWF for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

## NATURE OF THE CASE

7.     To supplement its revenues, NWF rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as age, child's age, ethnicity, gender, homeowner status, and income—to data aggregators, data appenders, data cooperatives, and other third parties, on a monthly basis, without the written consent of its customers. NWF continuously engaged in these same practices since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period.

8.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, NWF is able to disclose the information time and time again to countless third parties.

9.     NWF's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particular members of society.  For example, anyone could buy a customer list provided by NWF that contains the names and addresses of all Asian

women in Michigan over the age of 30 who have a child between the ages of 7 and 10, earn an annual income of greater than $80,000, own their home, and subscribe to *Ranger Rick* magazine. Such a list is available for sale on the open market for approximately $180.00 per thousand subscribers listed.

10. While NWF profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because NWF does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## PARTIES

11. Plaintiff is a natural person and a citizen and resident of the State of Michigan. Plaintiff was a subscriber to *Ranger Rick* magazine, including prior to July 31, 2016. *Ranger Rick* magazine is published by NWF. While residing in, a citizen of, and present in Michigan, Plaintiff's subscription to *Ranger Rick* magazine was purchased directly from NWF. Prior to and at the time Plaintiff subscribed to *Ranger Rick*, NWF did not notify Plaintiff that it discloses the Private Reading Information of its customers, and Plaintiff has never authorized NWF to do so. Furthermore, Plaintiff was never provided any written notice that NWF rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. Since subscribing to *Ranger Rick*, and during the relevant pre-

July 31, 2016 time period, NWF disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.  Moreover, during that same period, NWF rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact NWF subscribers, without first obtaining the requisite written consent from Plaintiff or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

12.     Defendant National Wildlife Federation is a Washington, D.C. corporation with its headquarters and principal place of business in Reston, Virginia. NWF does business throughout Michigan and the entire United States. NWF is the publisher of *National Wildlife*, *Zoobooks*, *Zootles*, *Ranger Rick Dinosaurs*, *Ranger Rick Cub*, and *Ranger Rick Jr.* magazines, as well as its flagship publication *Ranger Rick* magazine.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

7

14. The Court has personal jurisdiction over NWF because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Ranger Rick* subscription in Michigan, NWF's direction of such *Ranger Rick* subscription into Michigan, and NWF's failure to obtain Plaintiff's written consent in Michigan prior to disclosing her Private Reading Information, including her residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over NWF in Michigan because NWF conducts substantial business within Michigan, such that NWF has significant, continuous, and pervasive contacts with the State of Michigan.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, NWF does substantial business in this judicial District, NWF is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

16. In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information

generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

18.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

19.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected

from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

22.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

23.     Despite the fact that thousands of Michigan residents subscribe to NWF's publications, NWF disregarded its legal responsibility by systematically

10

violating the PPPA.

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

25.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or why
> their information may be commercially valuable. Data is
> currency. The larger the data set, the greater potential for

---

[3]     **Exhibit C**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf  (last visited July 30, 2021).

[4]     *See* **Exhibit D**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

analysis—and profit.[5]

27.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

28.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

29.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of

---

[5]    **Exhibit E**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

[6]    *See* **Exhibit F**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[7]    **Exhibit G**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

information about consumers that are now available."[8]

30.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

31.    In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

32.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure

---

[8]    **Exhibit H**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[9]    *See* **Exhibit I**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[10]    *Id.*

unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like NWF share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

33. Information disclosures like those made by NWF are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where

---

[11] *See* **Exhibit J**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[12] **Exhibit K**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[13] *Id.*

[14] **Exhibit L**, *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-

the private information of vulnerable elderly Americans is exchanged.

34.     Thus,   information   disclosures   like   NWF's   are   particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[15]

35.     NWF is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### *Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases*

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

38.     A  recent  survey  conducted  by  Harris  Interactive  on  behalf  of

---

statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

[15]     *See id.*

TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[17]

39.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

40.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[18]

41.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the

---

[16]     *See* **Exhibit M**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[17]     *Id.*

[18]     *See* **Exhibit N**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[19]

42.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

### *NWF Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading Information*

43.    NWF maintains a vast digital database comprised of its customers' Private Reading Information.  NWF discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each NWF customer, including his or her age, child's age, ethnicity, gender, homeowner status, and income.  (*See, e.g.*, **Exhibit A**).

44.    NWF then rents and/or exchanges its mailing lists—which include

---

[19]    *See* **Exhibit O**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), discussed in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[20]    *See* **Exhibit P**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

45.    NWF also discloses its customers' Private Reading Information to data cooperatives, who in turn give NWF access to their own mailing list databases.

46.    As a result of NWF's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from NWF that identify NWF's customers by their most intimate details such as their age, child's age, ethnicity, gender, homeowner status, and income.  NWF's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

47.    NWF does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

48.    Consumers can sign up for subscriptions to NWF's publications through numerous media outlets, including the Internet, telephone, or traditional

mail.   Regardless of how the consumer subscribes, NWF never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, NWF uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

49.   As a result, NWF disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

50.   By and through these actions, NWF has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

51.   Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by NWF without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling

---

[21]   **Exhibit Q**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

interest, and officers or directors of Defendant.

52.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

53.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: (a) whether NWF is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether NWF obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading Information; and (c) whether NWF's disclosure of Plaintiff's and the Class's Private Reading Information violated the PPPA.

54.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading Information.

55.     Plaintiff is an adequate representative of the Class because her interests

do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

56.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

57.     Plaintiff repeats the allegations contained in the foregoing paragraphs

as if fully set forth herein.

58.   Plaintiff brings this claim individually and on behalf of members of the Class against Defendant NWF.

59.   As a magazine publisher that sells subscriptions to consumers, NWF is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

60.   By purchasing a subscription to *Ranger Rick* magazine, Plaintiff purchased written materials directly from NWF.  *See* PPPA § 2.

61.   Because Plaintiff purchased written materials directly from NWF, Plaintiff is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

62.   At various times during the pre-July 31, 2016 time period, NWF disclosed Plaintiff's Private Reading Information, which identified her as a *Ranger Rick* customer, in at least three ways.

63.   First, NWF disclosed mailing lists containing Plaintiff's Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NWF.

64.   Second, NWF disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave NWF access to their own mailing list databases.

65.   Third, NWF rented and/or exchanged its mailing lists containing

Plaintiff's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

66.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and NWF was able to increase its profits gained from the mailing list rentals and/or exchanges.

67.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, NWF disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from NWF.  *See* PPPA § 2.

68.     The information NWF disclosed indicates Plaintiff's name and address, among other personal and identifying information as reflected in the Nextmark data card shown above, as well as the fact that she purchased a subscription to *Ranger Rick*.   Accordingly, the records or information disclosed by NWF indicated Plaintiff's identity.  *See* PPPA § 2.

69.     Plaintiff and the members of the Class never consented to NWF disclosing their Private Reading Information to anyone.

70.     Worse yet, Plaintiff and the members of the Class did not receive notice before NWF disclosed their Private Reading Information to third parties.

71.     NWF's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

72.     NWF's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

73.     NWF's disclosures of Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase NWF's revenue.  Accordingly, NWF's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

74.     By disclosing Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, NWF violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits.  *See* PPPA § 2.

75.     As a result of NWF's unlawful disclosure of their Private Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of herself and the Class, Plaintiff seeks: (1) $5,000.00 per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.   For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.   For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.   For prejudgment interest on all amounts awarded; and

F.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: September 8, 2022                Respectfully submitted,

                                        **SHERRY GAINES**,

                                        /s/ *E. Powell Miller*
                                        E. Powell Miller (P39487)
                                        Sharon S. Almonrode (P33938)

THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I, E. Powell Miller, an attorney, hereby certify that on September 8, 2022, I served the above and foregoing document on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.

/s/ E. Powell Miller
E. Powell Miller
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste 300
Rochester, MI 48307
Tel: 248.841.2200