# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SHERRY GAINES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL WILDLIFE FEDERATION,<br><br>Defendant. | Case No. 5:22-cv-11173-JEL-CI<br><br><br>Hon. Judith E. Levy<br><br>Mag. Curtis Ivy, Jr. |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S <u>FIRST AMENDED COMPLAINT</u>

## STATEMENT OF ISSUES PRESENTED

1. Does the six-year limitation period found in M.C.L. § 600.5813 govern Plaintiff's statutory claim for violation of the PPPA – a statute that promulgates a cause of action never before recognized at common law and which does not itself specify a limitation period?

**Plaintiff's Answer: Yes.**

2. Was the limitation period applicable to Plaintiff's PPPA claim tolled for 101 days between March 10, 2020 and June 20, 2020 pursuant to Executive Orders 2020-58 and 2020-122 issued by the Governor of Michigan and Administrative Orders 2020-3 and 2020-18 issued by the Michigan Supreme Court, such that the "relevant pre-July 31, 2016 time period" is February 20, 2016 (six years plus 101 days before the date on which this action was initiated) through July 30, 2016 (the last date that the unamended version of the PPPA that Plaintiff invokes in this case was in effect)?

**Plaintiff's Answer: Yes.**

3. Are the First Amended Complaint's factual allegations that, during the relevant pre-July 31, 2016 time period, Defendant disclosed "Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives," as well as "rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact NWF subscribers, without first obtaining the requisite written consent from Plaintiff" (*see* First Amended Class Action Complaint (ECF No. 15) at ¶ 11) – allegations which are bolstered by a screenshot of a data card offering for sale on Defendant's behalf Ranger Rick subscriber information "through" March 1, 2022 (*Id.* at ¶ 2 & Ex. A) – sufficient to plausibly suggest an entitlement to relief under the version of Michigan's Preservation of Personal Privacy Act in effect through July 30, 2016?

**Plaintiff's Answer: Yes.**

i

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

M.C.L. § 600.5813

*Palmer Park Square, LLC v. Scottsdale Ins. Co.*, 878 F.3d 530 (6th Cir. 2017)

*Krassick v. Archaeological Institute of Am.*, 2022 WL 2071730 (W.D. Mich. June 9, 2022)

*Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022)

*Hall v. Farm Journal, Inc.*, Case No. 21-cv-11811, ECF No. 26 (E.D. Mich. Apr. 5, 2022)

*DiPonio Const., Inc. v. Rosati Masonry Co., Inc.*, 631 N.W.2d 59 (Mich. App. 2001)

*Dep't of Envtl. Quality v. Gomez*, 896 N.W.2d 39 (Mich. App. 2016)

*Citizens of Pretrial Justice v. Goldfarb*, 327 N.W.2d 910 (Mich. 1982)

*Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84 (Mich. App. 2002)

*Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017)

*Kinder v. Meredith Corp.*, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014)

*Nashel v. New York Times Co.*, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022)

*Cataldo v. U.S. Steel Corp.*, 676 F.3d 542 (6th Cir. 2012)

Mich. Executive Order 2020-58

Mich. Executive Order 2020-122

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ..................................................... i

CONTROLLING AND MOST APPROPRIATE AUTHORITIES ........................... ii

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION ............................................................................. 1

THE PPPA ..................................................................................... 4

FACTUAL ALLEGATIONS OF THE FAC ................................................. 5

ARGUMENT ................................................................................... 7

   I.     PPPA Claims Are Governed by a Six-Year Limitation Period That Was Tolled for 101 Days Pursuant to the Governor of Michigan's Executive Orders ..... 8

   II.    The FAC Adequately Alleges That Defendant Disclosed Plaintiff's Private Reading Information in Violation of the PPPA During the Relevant Pre-July 31, 2016 Time Period ........................................................................... 12

   III.   If The Court Concludes That Any Portion of the FAC Should Be Dismissed, Leave to Amend Should Be Granted ..................................................... 25

CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 21

*Blaha v. A.H. Robins & Co.*,
  708 F.2d 238 (6th Cir. 1983) .................................................................................. 11

*Boelter v. Advance Mag. Publishers Inc.*,
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) .................................................................... 14

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ............................................................... 1, 14

*Boelter v. Hearst Commc'ns, Inc.*,
  269 F. Supp. 3d 172 (S.D.N.Y. 2017) .................................................................... 13

*Bowles v. Sabree*,
  2022 WL 141666 (E.D. Mich. Jan. 14, 2022) ........................................................ 11

*Bownes v. Borroughs Corp.*,
  2021 WL 1921066 (W.D. Mich. May 13, 2021) .................................................... 11

*Cain v. Redbox Automated Retail, LLC*,
  981 F. Supp. 2d 674 (E.D. Mich. 2013) ............................................................. 18, 19

*Cataldo v. U.S. Steel Corp.*,
  676 F.3d 542 (6th Cir. 2012) .................................................................................. 22

*Citizens for Pretrial Justice v. Goldfarb*,
  327 N.W.2d 910 (Mich. 1982) .................................................................................. 9

*DiPonio Constr. Co. v. Rosati Masonry Co.*,
  631 N.W.2d 59 (Mich. Ct. App. 2001) ............................................................... 9, 10

*Foman v. Davis*,
  371 U.S. 178 (1962) ................................................................................................. 25

*Hall v. Farm Journal, Inc.*,
  Case No. 21-cv-11811 (E.D. Mich. Apr. 5, 2022) ........................................... 8, 9, 10

*Horton v. GameStop Corp.*,
  380 F. Supp. 3d 679 (W.D. Mich. 2018) ........................................................... passim

*Howard v. Onion*,
  2022 WL 2065950 (6th Cir. May 17, 2022) ........................................................... 11

*Krassick v. Archaeological Institute of Am.*,
  2022 WL 2071730 (W.D. Mich. June 9, 2022) ................................................ 8, 9, 10

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ................................................................................................... 1

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................. 20

*Mackey v. Rising,*
    2021 WL 4034226 (E.D. Mich. Sept. 3, 2021) .............................................................. 11
*Moeller v. Am. Media, Inc.,*
    235 F. Supp. 3d 868 (E.D. Mich. 2017) ........................................................................ 14
*Nashel v. New York Times Co.,*
    2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) ......................................................passim
*Nat'l Sand v. Nagel Constr., Inc.,*
    451 N.W.2d 618 (Mich. Ct. App. 1990) .......................................................................... 9
*Palmer Park Square, LLC v. Scottsdale Ins. Co.,*
    878 F.3d 530 (6th Cir. 2017) ............................................................................................ 9
*Perlin v. Time Inc.,*
    237 F. Supp. 3d 623 (E.D. Mich. 2017) ........................................................................ 14
*Pratt v. KSE Sportsman Media, Inc.,*
    586 F. Supp. 3d 666 (E.D. Mich. 2022) ................................................................passim
*Purnell v. Arrow Fin. Servs., LLC,*
    2009 WL 1508340 (E.D. Mich. May 29, 2009) .............................................................. 9
*Smith v. Hilliard,*
    578 F. App'x 556 (6th Cir. 2014) .................................................................................. 11
*Straus v. Governor,*
    592 N.W.2d 53 (Mich. 1999) ........................................................................................ 10
*Wallace v. Kato,*
    549 U.S. 384 (2007) ....................................................................................................... 11
*Wheaton v. Apple Inc.,*
    2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) ......................................................... 18, 19
*Zimmerman v. 3M Company,*
    542 F. Supp. 3d 673 (W.D. Mich. 2021) ...................................................................... 12

**Statutes**

H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by
    H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) ........................ 1, 4, 5
M.C.L. § 600.5805(2) ......................................................................................................... 2, 9
M.C.L. § 600.5813 .............................................................................................................passim
Michigan's Video Rental Privacy Act ("VRPA") ...............................................................passim
S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. §
    445.1711, *et seq.*) ............................................................................................................. 1

## Other Authorities

Mich. Executive Order 2020-122 ................................................................. 10

Mich. Executive Order 2020-58 ................................................................... 10

Mich. Supreme Court Administrative Order 2020-18 .................................... 10

Mich. Supreme Court Administrative Order 2020-3 ...................................... 10

*Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 ........................................................................................... 5

## Rules

Fed. R. Civ. P. 8 ..................................................................................... 12, 17

Fed. R. Civ. P. 12(b)(6) ...................................................................... 1, 17, 22

Fed. R. Civ. P. 15(a) .................................................................................... 25

Plaintiff Sherry Gaines ("Plaintiff"), individually and on behalf of all others similarly situated, submits this response in opposition to Defendant National Wildlife Federation's ("NWF" or "Defendant") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 18) (the "Motion" or "Mot.").

## INTRODUCTION

In this putative consumer class action, Plaintiff alleges that Defendant violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without her consent, information that identified her as (*inter alia*) a subscriber to Defendant's *Ranger Rick* magazine. On behalf of herself and others similarly situated, Plaintiff seeks to recover $5,000, as provided by the PPPA, for each of Defendant's statutory violations.

Defendant moves to dismiss Plaintiff's First Amended Class Action Complaint ("FAC") (ECF No. 15) on two grounds: 1) Plaintiff's PPPA claim is subject to the

---

[1]     The PPPA (occasionally referred to in the caselaw as the "Video Rental Privacy Act" or the "VRPA") is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

1

three-year limitation period found in Michigan Compiled Laws ("M.C.L.") § 600.5805(2) and is thus untimely; and 2) even if the six-year limitation period found in M.C.L. § 600.5813 applies, Plaintiff fails to adequately allege that Defendant disclosed her information to third parties during the relevant pre-July 31, 2016 time period. *See* ECF No. 18. Each of these arguments is without merit.

<u>First</u>, it is well established that "[a] six-year statute of limitations applies to PPPA claims." *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 673 (E.D. Mich. 2022). Four federal district courts in Michigan (in both the Eastern and Western Districts) have uniformly held that PPPA claims are subject to the six-year period found in section 600.5813 (not the three-year period found in 600.5805(2)). As each of these courts explained, any attempt to invoke the three-year limitation period found in section 600.5805(2) is foreclosed by controlling Sixth Circuit precedent holding that all statutory claims under Michigan law are subject to the six-year period found in section 600.5813. This Court should adopt the reasoning of these prior decisions on the same issue and hold that section 600.5813's six-year limitation period governs Plaintiff's claim. Under the six-year limitation period, and affording Plaintiff and Class members the benefit of 101 days of tolling pursuant to the Governor's Executive Orders, the Court should conclude that any disclosures of Plaintiff's and Class members' personal information that occurred between February 20, 2016 and July 30, 2016 (i.e., the "relevant pre-July 31, 2016 time period") are actionable.

2

Second, Plaintiff adequately states a claim for violation of the PPPA that accrued during the relevant pre-July 31, 2016 time period, i.e., between February 20, 2016 (six years plus 101 days before the date on which this action was initiated) and July 30, 2016 (the last date that the unamended version of the PPPA that Plaintiff invokes in this case was in effect). The FAC specifically alleges that, "during the relevant pre-July 31, 2016 time period," NWF "continuously" – i.e., at least as frequently as "on a monthly basis" – "rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information of its entire database [of] its Michigan-based subscribers," inclusive of "Plaintiff's Private Reading Information," to various third parties, including "data aggregators, data appenders, data cooperatives, and list brokers, among others," all without its subscribers' consent. FAC ¶¶ 1-2, 5, 7; *see also id.* ¶¶ 62-65. Moreover, as recounted in detail in the FAC, since at least "as far back as the beginning of 2015," including "throughout the relevant pre-July 31, 2016 time period," and continuing up until the present, NWF has publicly offered to sell (on the "data cards" it has listed on Nextmark's website and other such data-brokerage websites), to any interested purchaser, the Personal Reading Information of all of its "U.S. based purchaser[s] of subscription[s]" to *Ranger Rick* and its other publications. FAC ¶ 2; *see also id.* ¶ 7 ("[NWF] continuously engaged in these same practices since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period."). The FAC further shoves these allegations across the line of plausibility by attaching a screenshot

depicting NWF's publicly accessible "data card" in existence today, FAC ¶ 2, by reciting the text of the same, substantially identical data card as it existed throughout the relevant pre-July 31, 2016 time period, *id.* ¶ 3, and by explaining that "Plaintiff[] saw a dramatic uptick of junk mail in [her] mailbox[] following [her] purchases of subscriptions to NWF's publications over the same [pre-July 31, 2016] time period" in which NWF was actively renting, exchanging, or otherwise disclosing her Personal Reading Information to these third parties. FAC ¶ 4; *see also id.* ¶ 1 ("As a result [of NWF's disclosure practices during the relevant pre-July 31, 2016 time period], Plaintiff has received a barrage of unwanted junk mail."). Taken together, these factual allegations – which are well-pled and must be accepted as true at this stage of the proceedings – more than adequately state a claim for relief under the PPPA. Indeed, numerous courts across the country in other PPPA publication cases have overwhelmingly concluded that plaintiffs stated plausible claims for relief based on substantially the same facts as alleged in the FAC.

The FAC states a timely claim for relief. The Motion should be denied.

## THE PPPA

In 1988, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials" by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West). Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged
> in the business of selling at retail, renting, or lending books
> or other written materials, sound recordings, or video

4

> recordings *shall not disclose* to any person, other than the
> customer, a record or information concerning the purchase
> . . . of those materials by a customer that indicates the
> identity of the customer.

PPPA § 2 (emphasis added).

Michigan's passage of the PPPA established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989. *See* FAC, Ex. B.

## FACTUAL ALLEGATIONS OF THE FAC

Defendant maintains a vast digital database comprised of all of its customers' information—namely the Private Reading Information (or "PRI") "as well as myriad other categories of individualized data and demographic information such as age, child's age, ethnicity, gender, homeowner status, and income." FAC ¶¶ 7, 43.

During the relevant pre-July 31, 2016 time period, Defendant continuously "rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information of its entire database of . . . subscribers" to various third parties. *Id.* ¶ 5. Indeed, since as far back as 2015 and continuing up until the present, including throughout the entire relevant pre-July 31, 2016 time period, Defendant "continuously" disclosed ("on a monthly basis") the PRI of all of its customers (including Plaintiff) in at least three ways. *Id.* ¶¶ 7, 62. First, Defendant disclosed mailing lists containing Plaintiff's (along with all

of its other customers') PRI to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendant. *Id.* ¶ 63. Second, Defendant disclosed mailing lists containing Plaintiff's (along with all of its other customers') PRI to data cooperatives, who in turn gave Defendant access to their own mailing list databases. *Id.* ¶ 64. And third, Defendant rented and/or exchanged its mailing lists containing Plaintiff's (along with all of its other customers') PRI – enhanced with additional information from data aggregators and appenders – to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes. *Id.* ¶ 65.

The FAC includes a screenshot of the *Ranger Rick* subscriber "data card" publicly available on list broker NextMark, Inc.'s website, in which Defendant offers to rent or exchange the PRI of all of its subscribers – current "through" March 1, 2022 – to anyone interested in purchasing it. *Id.* ¶ 2, Ex. A (ECF No. 15-2). Plaintiff further alleges that "[t]he same or a substantially similar 'data card' as the one shown [in ¶ 2 of the FAC], with the same rates and the same advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Defendant as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period[.]" *Id.* The FAC even recites the text of Defendant's data card that existed during the relevant pre-July 31, 2016 time period. *Id.*

¶ 3 ("[D]uring relevant pre-July 31, 2016 time period, NextMark also offered to provide renters access to the mailing list titled 'Ranger Rick Marketing Genetics Masterfile', which contains the PRI of all 753,350 of Defendant's then-active and recently expired U.S. subscribers at a base price of '$105.00/M [per thousand],' (i.e., 10.5 cents apiece).").

Thus, "[Defendant] was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period." *Id.* ¶ 2. "As a result of [Defendant]'s practices of disclosing [her] Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff[] saw a dramatic uptick of junk mail in [her] mailbox[] following [her] purchases of subscriptions to [Defendant's] publications over the same time period." FAC ¶ 4.

By renting, exchanging, or otherwise disclosing the PRI of Plaintiff and its other Michigan-resident subscribers during the relevant pre-July 31, 2016 time period, Defendant violated the PPPA. *Id.* ¶¶ 5, 67. Plaintiff seeks $5,000.00 for herself and each Class member pursuant to PPPA § 5(a) and costs and reasonable attorneys' fees pursuant to PPPA § 5(b). *Id.* ¶ 75.

## ARGUMENT

The FAC plausibly states a claim for relief that accrued during the six-year limitation period applicable to a PPPA claim. Therefore, the Motion should be denied in its entirety.

7

## I.  PPPA Claims Are Governed by a Six-Year Limitation Period That Was Tolled for 101 Days by the Governor of Michigan's Executive Orders

Defendant argues that a three-year statute of limitations should apply to Plaintiff's PPPA claim. Mot. at 14-19. But, as Defendant concedes, its argument finds no support in the case law, which has unanimously held that a six-year statute of limitations applies to PPPA claims. *See* Mot. at 15 (collecting cases saying the same).

The Eastern and Western Districts of Michigan are in unanimous agreement that "the six-year statute of limitations in [M.C.L.] § 600.5813 governs a PPPA claim." *Krassick v. Archaeological Institute of Am.*, 2022 WL 2071730, at *5 (W.D. Mich. June 9, 2022) (Jarbou, J.); *Pratt*, 586 F. Supp. 3d at 673 (Ludington, J.) ("A six-year statute of limitations applies to PPPA claims."); *Hall v. Farm Journal, Inc.* (Lawson, J.), 2:21-cv-11811 ECF No. 26, PageID.718 ("The plaintiff's claim is governed by Section 5813, and therefore, the claim appears to be timely for the purpose of this motion."). No court has ever decided this question – i.e., whether a PPPA claim is governed by a six-year limitation period or a three-year period – in favor of the three-year period. Indeed, even the *Nashel* decision thoroughly considered and rejected the same arguments made by Defendant here in holding that a six-year statute of limitations applies to PPPA claims. *See Nashel v. New York Times Co.*, 2022 WL 6775657, at *3-4 (E.D. Mich. Oct. 11, 2022) ("In the end, Defendant's framing of the PPPA as an invasion-of-privacy tort is too broad. Rather, the PPPA protects against a particular kind of invasion – the dissemination of one's reading materials, name, and address without consent. And

before the PPPA, Michigan courts did not recognize the injury as a traditional tort . . . Accordingly, the residual six-year statute of limitations governing all other personal actions, § 5813, applies to the present case.") (citations omitted).

The decisions in *Krassick*, *Pratt*, and *Hall* (and on the issue of the statute of limitations only, *Nashel*) are each well-reasoned and firmly supported by Sixth Circuit and Michigan appellate authority. *See Palmer Park Square, LLC v. Scottsdale Ins. Co.*, 878 F.3d 530, 540 (6th Cir. 2017) (holding that "§ 600.5813 applies to statutory causes of action, including those for civil fines"); *DiPonio Constr. Co. v. Rosati Masonry Co.*, 631 N.W.2d 59, 66 (Mich. Ct. App. 2001) (holding that "a civil cause of action arising from a statutory violation is subject to the six-year limitation period in § 5813, if the statute itself does not provide a limitation period"); *Citizens for Pretrial Justice v. Goldfarb*, 327 N.W.2d 910, 915 (Mich. 1982) (holding that § 5805 only "applies to traditional, primarily common-law torts"); *Nat'l Sand v. Nagel Constr., Inc.*, 451 N.W.2d 618, 622 (Mich. Ct. App. 1990) (stating that because "the plaintiffs' injury was not the result of a traditional tort, it must fall under the residual six-year period of limitation contained in § 5813"); *see also Purnell v. Arrow Fin. Servs., LLC*, 2009 WL 1508340, at *2 (E.D. Mich. May 29, 2009) ("The mere fact that Plaintiff's allegations may be, in some manner, shoe-horned into a common-law tort cannot control in light of clear direction that where 'plaintiff's civil cause of action [is] for . . . a statutory violation, [the court should apply] the six-year limitation period found in § 5813.'") (Citing *DiPonio*, 631 N.W.2d at 66) (alterations

in original). This Court should adopt the reasoning of the decisions in *Pratt*, *Krassick*, and *Hall* (and *Nashel* on the issue of the statute of limitations only) and hold that the six-year limitation period found in section 600.5813 governs Plaintiff's PPPA claim.

Additionally, the six-year limitation period governing Plaintiff's claim was tolled for 101 days from March 10, 2020, through June 20, 2020, by Governor Whitmer's Executive Orders and the Michigan Supreme Court's Administrative Order (together, the "COVID-19 Orders") tolling the statute of limitations for all Michigan claims due to COVID-19. *See* Mich. Executive Order 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, <u>including but not limited to any deadline for filing an initial pleading</u> . . . are suspended as of March 10, 2020 <u>and shall be tolled</u> until the end of the declared states of disaster and emergency.") (emphasis added); Mich. Supreme Court Administrative Order 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, <u>including but not limited to the deadline for the initial filing of a pleading</u> . . . any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included.") (emphasis added); *see also* Mich. Executive Order 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order 2020-18 (same).

Under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation." *Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999). "Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal

courts sitting in diversity." *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983). "Just as limitations periods are taken from state law, so are the rules regarding tolling." *Smith v. Hilliard*, 578 F. App'x 556, 562 (6th Cir. 2014) (citing *Wallace v. Kato*, 549 U.S. 384, 394 (2007)) ("We have generally referred to state law for tolling rules, just as we have for the length of statute of limitation."). Thus, because the *Erie* doctrine requires this Court to apply Michigan statute of limitations and tolling rules, and because the COVID-19 Orders have the same status as enacted legislation under Michigan law, the Court is compelled to apply the COVID-19 Orders and find that the statute of limitations was tolled from March 10, 2020, to June 20, 2020.

Courts in both Michigan District Courts have held that the COVID-19 Orders toll the statute of limitations for Michigan state-law claims. *See Bownes v. Borroughs Corp.*, 2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021) (holding plaintiff's Elliot-Larsen Civil Rights Act claim was tolled from March 10, 2020, to June 20, 2020 by COVID-19 Orders); *Mackey v. Rising*, 2021 WL 4034226, at *2 (E.D. Mich. Sept. 3, 2021) (holding same in § 1983 action); *Bowles v. Sabree*, 2022 WL 141666, at *9 (E.D. Mich. Jan. 14, 2022) (same); *see also Howard v. Onion*, 2022 WL 2065950, at *2 (6th Cir. May 17, 2022) (concluding same under Ohio law). This Court should reach the same conclusion here.

Because Plaintiff's PPPA claim was tolled for 101 days from March 10, 2020 through June 20, 2020, the six-year limitation period governing Plaintiff's claim reaches

back to February 20, 2016[2] – not May 30, 2016 as incorrectly stated in the Motion. *See* Mot. at 14. Thus, the "relevant pre-July 31, 2016 time period" runs from February 20, 2016 through July, 30, 2016.

## II.  The FAC Adequately Alleges That Defendant Disclosed Plaintiff's Private Reading Information in Violation of the PPPA During the Relevant Pre-July 31, 2016 Time Period

The FAC's allegations plausibly demonstrate that Defendant disclosed Plaintiff's PRI in violation of the PPPA between February 20, 2016 (the earliest date Plaintiff is able to seek relief for Defendant's PPPA violations pursuant to the applicable six-year limitation period, as tolled by the Governor's orders) and July 30, 2016 (the last date that the unamended version of the PPPA was in effect).

Review of the FAC is governed by the liberal Rule 8 pleading standard. Plaintiff is not required to prove her claim with evidence at this time. She must merely allege facts that plausibly suggest Defendant violated the PPPA. *See, e.g.*, *Zimmerman v. 3M Company*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021) (Rule 8 pleading standard satisfied in class action where named plaintiffs alleged that they were exposed to purportedly harmful chemical in drinking water, without alleging "whether any PFAS ha[d] been detected in their drinking water, and if so, how much").

"As relevant to this action, the Michigan [PPPA] prohibits a person, and an

---

[2]     Six years is 2,190 days. Six years plus 101 days is 2,291 days. And the 2,291st day prior to May 30, 2022 (the date the original Complaint was filed) was February 20, 2016. *See Pratt*, 586 F. Supp. 3d at 675 n.6 (calculating limitation period the same way).

'employee or agent of the person,' 'engaged in the business of selling at retail . . . books or other written materials, . . . from 'disclos[ing] to any person, other than the customer,' 'a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer." *Boelter v. Hearst Comm'ns, Inc.*, 269 F. Supp. 3d 172, 177-78 (S.D.N.Y. 2017) (quoting PPPA § 2).

The FAC alleges that during the relevant pre-July 31, 2016 time period, NWF "continuously" disclosed (at least as frequently as "on a monthly basis") its *entire* digital customer database (comprised of the PRI of *all* of its customers, including Plaintiff and all Class members) to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 5, 7. Moreover, the FAC further alleges that NWF's entire customer database (containing the personal, PPPA-protected data pertaining to all of its customers, including Plaintiff and each Class member) has been advertised by NWF for rent, sale, and exchange on the open market since as far back as the beginning of 2015 and throughout the relevant pre-July 31, 2016 time-period, and that over the same time period NWF in fact routinely disclosed that entire customer database to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 1, 5, 7, 11, 43-47, 62-65. Plaintiff substantiates these factual allegations by including a screenshot of a data card posted on data-broker Nextmark's website that offers "renters access to the mailing list titled 'Ranger Rick Masterfile with Enhancements Mailing List', a list

13

which the data card indicates is comprised of the Private Reading Information" of all of NWF's subscribers. FAC ¶ 2, Ex. A (ECF No. 15-2). The data card indicates that the data is cumulative of all subscribers, with "counts through 03/01/2022." *Id.*

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 453 (S.D.N.Y. 2016); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 642 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016).

But the FAC does not stop there. Here, Plaintiff further alleges that "[t]he same or a substantially similar 'data card' as the one shown above, with the same rates and the same advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by NWF as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that NWF was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period." FAC ¶ 2. As the FAC explains, "during relevant pre-July 31, 2016 time period, NextMark also offered to provide renters access to the mailing list titled 'Ranger Rick Marketing Genetics Masterfile', which contains the

14

Private Reading Information of all 753,350 of NWF's then-active and recently expired U.S. subscribers at a base price of '$105.00/M [per thousand],' (i.e., 10.5 cents apiece)." *Id.* ¶ 3. Finally, the FAC also alleges that, "[a]s a result of NWF's practices of disclosing [Plaintiff's] Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff[] saw a dramatic uptick of junk mail in [her] mailbox[] following [her] purchases of subscriptions to NWF's publications over the same time period." *Id.* ¶ 4. These additional factual allegations – which were not alleged by the plaintiffs in the above-cited cases (but who were nonetheless found to have adequately stated PPPA claims) – only further confirm that Plaintiff has stated a plausible claim for relief here.

The recent decision in *Nashel* – relied upon heavily in the Motion – is readily distinguishable and, in any event, an outlier that was wrongly decided. The plaintiffs in *Nashel* pointed to data cards "published online in 2007 and 2008" to support their allegations that the Defendant disclosed its subscribers' eight years later during the applicable limitation period – and the court in *Nashel* seized on this "timing issue" in its order granting defendant's motion to dismiss. *See Nashel*, 2022 WL 6775657, at *5. In this case, on the other hand, there is no such "timing issue" because the FAC includes a screenshot of the "Ranger Rick Masterfile with Enhancements Mailing List" still today offered for sale by Defendant on Nextmark's website, which shows that Defendant's practices of systematically disclosing all of its customers' Personal Reading Information and other data (to third party data appenders, aggregators, renters, and others) has

persisted "through 03/01/2022," after the relevant pre-July 31, 2016 time period. FAC ¶ 2; *see also* Ex. A (ECF No. 15-2).[3] And notably, the FAC further alleges that a substantially identical data card existed in 2015 and 2016, for the duration of the relevant February 20, 2016 through July 30, 2016 time period, thus demonstrating that Defendant was engaged in the same systematic disclosures practices back then that it remains engaged in today. FAC ¶ 2; *see also id.* ¶ 3 (reciting text of 2015-16 data card advertised by Defendant on Nextmark's site). Therefore, unlike in *Nashel*, where the plaintiff's allegations of 2015-16 disclosures were unsupported by a data card that post-dated that timeframe (much less the text of the actual data card that existed during that timeframe), here Plaintiff has pled facts clearly establishing (and at the very least plausibly suggesting) that Defendant disclosed Plaintiff's and Class members' (and all of its other customers') PRI to third parties between at least 2015 and 2022.[4]

---

[3]    The screenshot of NextMark's data card in the FAC establishes that NWF's mailing list continued to be available online after the relevant pre-July 31, 2016 time period, whereas the screenshots in *Nashel* from 2007 and 2008 show that the New York Times mailing lists were available before the relevant pre-July 31, 2016 time period. Data sets comprise information gathered in the past. That is, a 2022 data set concerns actions taken in or prior to 2022 – evidenced by the language of the mailing list itself ("counts through") and as corroborated by numerous factual allegations of the FAC (*see, e.g.*, FAC ¶ 11; *id.* ¶¶ 43-50). The same may not be said of the 2007 and 2008 *Nashel* data cards screenshots, which pre-dated the relevant pre-July 31, 2016 time period.

[4]    The court in *Nashel* failed to address the plaintiffs' allegations – similar to those made by Plaintiff here – that they saw an "uptick in junk mail" in their mailboxes that coincided with the defendant's disclosures of their personal information to third parties (including aggressive marketers) during the relevant pre-July 31, 2016 time period. Plaintiff makes a similar allegation here in ¶ 4 of the FAC, and respectfully submits that it further bolsters the plausibility of Plaintiff's entitlement to relief under the PPPA.

16

Unconstrained by the timing issue related to the data cards identified in *Nashel*, the allegations of the FAC state a claim for violation of the PPPA. The FAC specifically alleges that Defendant disclosed its entire subscriber database, including Plaintiff's and all other Michigan customers' Private Reading Information, to numerous third parties during the relevant pre-July 31, 2016 time period. FAC ¶¶ 1-10, 11, 43-50.

Further, *Nashel* is an outlier in PPPA jurisprudence and Plaintiff firmly believes it was wrongly decided. The decision applied a pleading standard far more stringent than Rule 8 imposes,[5] and required specificity that no PPPA plaintiff could ever satisfy. Every other court to have presided over similar PPPA actions against publishers of written materials, arising from substantially the same allegations as those made by Plaintiff here, has held that these allegations adequately stated a claim under the PPPA

---

[5]    For one, *Nashel* improperly analyzed the plausibility of *the complaint's allegations*. *See Nashel*, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely *possible* rather than plausible"). This was plain error. On a motion to dismiss pursuant to Rule 12(b)(6), the question is not whether the complaint's allegations are plausible. Instead, the complaint's allegations must be accepted as true, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g.*, *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) (in deciding a Rule 12(b)(6) motion to dismiss, "the court must accept all well-pleaded allegations in the complaint as true, and consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) and citing *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (cleaned up). *Nashel* also recast allegations that were plainly factual in nature (such as, e.g., allegations that defendant systematically disclosed subscriber lists containing the plaintiff's PRI to specific third parties over a specific period of time) as "legal conclusions" merely because that underlying conduct happened to give rise to a PPPA claim. *See id.*, at *5.

– including, most recently, in a well-reasoned, published decision from the Hon. Gordon J. Quist of the Western District of Michigan in *Horton—see, e.g.*, *Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility"); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (Rosen, J.) (holding, in PPPA case, that at the motion to dismiss stage "this Court must take Plaintiffs' allegations regarding the relationship between Defendant and its 'unrelated' vendors as true").

Defendant cites to a non-binding, unpublished decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), but it is readily distinguishable. For one, the FAC contains many factual allegations concerning disclosures (made by a publisher pursuant to standard, industry-wide practices (*see* FAC ¶ 35), not by a technology company like Apple) that were not alleged in *Wheaton*. Moreover, in *Wheaton*, the plaintiffs alleged PPPA violations arising from alleged disclosures of music stored on their phones and relied on Nextmark data cards advertising the sale of this *sort* of data to bolster those allegations. *Id.* at *4. However, the defendant argued that it was not plausible to infer that Apple was even responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly) because that information (the existence of music files on a phone), unlike the PRI at issue in a case against a publisher

such as here (which is comprised of records concerning a purchase of a magazine subscription to one of Defendant's publications), was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a magazine plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, 3:19-cv-02883, dkt. 51 at 11-12 (defendant's reply in support of motion to dismiss). Here, on the other hand, NWF does not deny the reasonableness of inferring that the rental, sale, or exchange of records reflecting customers' purchases of subscriptions to *Ranger Rick* from NWF would necessarily have originated from the NWF (either directly or indirectly through intermediaries), including during the relevant pre-July 31, 2016 time period.[6] Finally, *Wheaton* is the only decision that has ever found a PPPA plaintiff's allegations insufficient to withstand a motion to dismiss, and Plaintiff respectfully submits that other courts' decisions on this issue in PPPA cases (such as *Horton* and *Cain*) are better reasoned and more persuasive.

NWF argues that the 2022-version of the Nextmark data card that appears in the FAC should be disregarded because "the data card shows that after March 1, 2022 –

---

[6]    When Plaintiff's counsel here has brought an action against a defendant that actually did not disclose the plaintiff's PRI during the relevant period, counsel for the defendant will reach out to plaintiff's counsel and provide a sworn declaration from the defendant attesting that it made no disclosures of the plaintiff's PRI to any third parties during that time period, at which point the plaintiff typically dismisses the case. Indeed, counsel for NWF has provided such declarations to Plaintiff's counsel in other similar actions, resulting in dismissal. *See, e.g.*, *Moore v. Direct Holdings America, Inc.*, No. 2:19-cv-14418 (S.D. Fla.). Here, by contrast, NWF has not offered to provide such a declaration.

nearly six years after any alleged statutory violation – a third party offered to sell certain information about some of NWF's active subscribers." Mot. at 8. NWF is mistaken regarding the import of the information on the data card. Contrary to NWF's assertion, the data card is *cumulative*, displaying "counts through 3/1/22." FAC ¶ 2. Moreover, NWF ignores Plaintiff's allegations, in FAC ¶¶ 2 and 3, that a substantially identical data card was available on the same website in 2015 and 2016, including throughout the relevant time period; the FAC recites verbatim the text of that data card offering, which clearly shows that Defendant was engaged in the same wholesale disclosure practices then as it is still engaged in today. *Id.* The data card plausibly establishes that NWF sold Plaintiff's and class members' PRI to third parties during the relevant pre-July 31, 2016 time period because the data card was available for purchase from at least 2015 through 2022. FAC ¶¶ 1-11, 43-50, 57-75. NWF glosses over these facts in an effort to liken this case to *Nashel*, but this faulty comparison fails.[7]

Defendant hedges further, arguing that the 2015 and 2022 data cards do "not establish that NWF plausibly violated the PPPA" because the "identifying information" was "slugged." Mot. at 10. NWF defines "slugged" to mean that "the subscriber's name

---

[7]     Defendant also attempts to diminish the 2015 data card because it "was not attached to the FAC." Mot. at 8. But Plaintiff is not required to prove her claim with "documents" or any other evidence at the pleading stage. She need only allege facts plausibly demonstrating that Defendant violated the PPPA. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 US 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice").

is not associated with the subscribed-to publication." *Id.* NWF adds that the "data card provides no suggestion as to what information was accessible through the mailing list." *Id.* These arguments seek to hold Plaintiff to an evidentiary standard at the pleading stage. The meaning of the term "slugged" and the scope and nature of the information accessible through the mailing list are evidentiary questions to be determined during the discovery process. At the pleading stage, Plaintiff need only plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiff carries this burden by plausibly establishing that NWF rented, sold, and/or exchanged its mailing list with Plaintiff's and Class members' PRI, including, *inter alia*, names and addresses, to third parties during the relevant time period of February 20, 2016 through July 30, 2016.

And while Defendant questions the source of the information in the data card (Mot. at 10), it is titled "Ranger Rick Masterfile with Enhancements Mailing List," which plausibly establishes disclosures that originated from the Defendant as Defendant is the only original source of its "masterfile subscriber list." *See Horton*, 380 F. Supp. 3d at 682. Importantly, the NextMark data card is just one example of many types of disclosures made by Defendant during the relevant time period. As another, in order to sell its "enhanced" lists on Nextmark, Defendant necessarily transmitted (in plain violation of the PPPA) its entire customer database to third party data appenders on a regular, systematic basis (at least once a month) to have additional lifestyle and demographic

21

information added to the database about each customer.[8] FAC ¶¶ 1-11, 43-50, 57-75. The full extent of Defendant's disclosure practices, and the full list of the entities to whom Defendant disclosed this information, is not fully known at this time but will be revealed in short order if Plaintiff is afforded a reasonable opportunity for discovery.

Finally, Defendant argues that Plaintiff "has failed to plead that her claims are timely, as this Court can make no reasonable inference as to the date Plaintiff's claims accrued in her threadbare FAC." Mot. at 13. The argument fails for two reasons: 1) a statute of limitations defense is an affirmative defense and Plaintiff need not plead compliance with the statute of limitations to state a plausible claim for relief, and 2) Plaintiff adequately pleads that her Private Reading Information was unlawfully disclosed by Defendant within the tolled six-year limitation period.

First, "[t]he statute of limitations is an affirmative defense . . . and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim . . . . For this reason, a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Thus, Plaintiff does not need to affirmatively plead compliance with the statute of limitations

---

[8]     As indicated by the title of the data card advertised for sale during the relevant pre-July 31, 2016 time period, it appears Defendant systematically disclosed its entire customer database (including Plaintiff's Personal Reading Information) to "Marketing Genetics" for appending of additional data during that time period. *See* FAC ¶ 3.

in order to state a claim for relief.

Second, the FAC alleges that Plaintiff subscribed to *Ranger Rick*, and had her PRI disclosed by Defendant, prior to July 31, 2016. Moreover, in footnotes 1 and 2 of the FAC, Plaintiff makes clear that the "relevant pre-July 31, 2016 time period" is the period that begins on the earliest possible date of an actionable statutory violation (six years prior to the case's filing) pursuant to the governing six-year statutory period set forth in M.C.L. 600.5813 (which the Governor of Michigan tolled for 101 days during the COVID-19 pandemic), and ends on July 30, 2016 (the last date on which the version of the statute invoked in this case existed prior to the effective date of its amendment). *See* FAC ¶ 1 n.1 (stating that "[t]he statutory period for this action is six years," and citing M.C.L. § 600.5813); *id.* ¶ 1 n.2 ("Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case."). Thus, the relevant period is from February 20, 2016 through July 30, 2016.

And as previously discussed, the FAC alleges many facts plausibly demonstrating that Defendant disclosed Plaintiff's PRI in violation of the PPPA during that applicable time period. Plaintiff alleges that she was "a subscriber to Ranger Rick magazine, including prior to July 31, 2016." *Id.* ¶ 11. Plaintiff alleges that from at least 2015 through 2022, Defendant "continuously" disclosed, at least as frequently as "on a monthly basis," all of its customers' (including Plaintiff's) PRI to various third parties. *See, e.g.,*

FAC ¶¶ 2-5, 7, 11. This allegation is bolstered by (1) the screenshots and text of the data cards Defendant currently advertises for sale on Nextmark's website (with a listed subscriber count "through" 2022) and, notably, previously advertised for sale on Nextmark's website during the relevant pre-July 31, 2016 time period, *id.* ¶¶ 2-3; and (2) Plaintiff's allegation that "[a]s a result of Defendant's practices of disclosing [her] Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in [her] mailbox[] following [her] purchases of subscriptions to [Defendant]'s publications over the same time period," *id.* ¶ 4; *see also id.* ¶ 1. Thus, the FAC contains many facts plausibly demonstrating that Defendant's practice of renting, selling, exchanging and otherwise disclosing all of its subscribers' PRI was occurring prior to July 31, 2016, during the applicable statutory period that begins on February 20, 2016, just as it continues today.

What Defendant really wants is to turn the PPPA into a toothless tiger. The crux of this lawsuit is that Defendant *failed to inform* Plaintiff and the proposed class members that it would disclose their PRI to others and *failed to obtain their consent* prior to disclosing that Information to others. Plaintiff and the class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity, Defendant asks the Court to adopt a pleading standard no PPPA plaintiff could ever satisfy, emasculating this important

consumer protection statute and insulating Defendant from liability in the process. This Court need not go along. The FAC states a claim, and the Motion should be denied.

### III.   If The Court Concludes That Any Portion of the FAC Should Be Dismissed, Leave to Amend Should Be Granted

Defendant argues that any dismissal in this action should be with prejudice. Mot. at 19-20. The United States Supreme Court has made clear that "Rule 15(a) declares that leave to amend shall be freely given when justice so requires; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). If any part of the FAC is dismissed, Plaintiff respectfully requests that the Court grant leave to amend to afford Plaintiff an opportunity to cure any deficiencies identified by the Court in the FAC's allegations.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

Dated: November 3, 2022                    Respectfully submitted,

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2022, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
