## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

SHERRY GAINES, individually and on behalf of others similarly situated,

　　　　　　*Plaintiff*,

　　　v.

NATIONAL WILDLIFE FEDERATION,

　　　　　　*Defendant*.

Case No. 4:22-cv-11173-FKB-CI
Hon. F. Kay Behm
Magistrate Judge Curtis Ivy, Jr.

## DEFENDANT NATIONAL WILDLIFE FEDERATION'S ANSWER TO PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Defendant National Wildlife Federation ("NWF") hereby answers Plaintiff's First Amended Class Action Complaint as follows:

### INTRODUCTION

1.　　Defendant National Wildlife Federation ("NWF") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's purchases of *Ranger Rick* magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed her information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period,

NWF violated Michigan's Preservation of Personal Privacy Act. H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206 § 1 (Mich. 1989) (the "PPPA").

**ANSWER:  The allegations contained in Paragraph 1 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 1 of the FAC, including all footnotes. [1] NWF denies any remaining allegations contained in Paragraph 1.**

2.      Documented evidence confirms these facts. For example, a list broker, NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "Ranger Rick Masterfile with Enhancement Mailing List", which contains the Private Reading Information of all 651,679 of NWF's then-active and recently expired U.S. subscribers at a base price of $105.00/M [per thousand]," (i.e., 10.5 cents apiece), as shown in the screenshot below:

---

[1] NWF denies all of the footnotes in the FAC to the extent they contain any allegations that are inconsistent with the cited and referenced materials, and denies any remaining allegations contained in those footnotes. NWF also denies all allegations contained in the subheadings throughout the FAC.



**Ranger Rick Masterfile with Enhancements Mailing List**

This is a combined unduplicated masterfile of Ranger Rick, Ranger Rick Jr. and Ranger Rick Cub. Mailers can cut across the entire database or segment by subscribers, gift givers or expires. Through these childrens publications, kids learn all about animals, their habitats, and how to help endangered species and their environment. Ranger Rick is a magazine for children aged 7 and up. Published 10 times per year. Ranger Rick Jr. is a magazine for children ages 4-7. Published 10 times per year. Ranger Rick Cub is a magazine for children ages 0-4. Published 6 times per year.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 03/01/2022 | POPULARITY: | •••••• 100 |
|---|---|---|---|
| 651,679 TOTAL UNIVERSE / BASE RATE | $105.00/M | MARKET: | CONSUMER |
| 159,148 3 MONTH SUBSCRIBERS/GIFT GIVERS | + $15.00/M | CHANNELS: | ✉ |
| 365,230 6 MONTH SUBSCRIBERS/GIFT GIVERS | + $10.00/M | SOURCE: | OTHER |
| 546,566 12 MONTH SUBSCRIBERS/GIFT GIVERS | $105.00/M | PRIVACY: | UNKNOWN |
| 320,085 24 MONTH EXPIRES | $70.00/M | DMAT: | YES - MEMBER |
| FUNDRAISING/NON-PROFIT RATE | $75.00/M | STATUS: | STANDARD PROVIDER |
| CATALOG RATE | $80.00/M | GEO: | USA |

| DESCRIPTION | SELECTS | |
|---|---|---|
| This is a combined unduplicated masterfile of Ranger Rick, Ranger Rick Jr. and Ranger Rick Cub. Mailers can cut across the entire database or segment by subscribers, gift givers or expires. Through these children's publications, kids learn all about animals, their habitats, and how to help endangered species and their environment. | 1 MONTH HOTLINE | $20.00/M |
| | 3 MONTH HOTLINE | $15.00/M |
| | 6 MONTH HOTLINE | $10.00/M |
| | ADDITIONAL COUNTS | |
| | ADULT AGE | $12.00/M |
| | CHILD AGE | $12.00/M |
| | DEMOGRAPHIC | $12.00/M |
| | ETHNICITY/RELIGION/POLITICAL | $17.00/M |
| | GENDER/SEX | $10.00/M |
| | HOMEOWNER | $12.00/M |
| | INCOME | $12.00/M |
| | LIFESTYLE | $17.00/M |
| | MEMBERSHIP FLAG | $7.00/M |
| | PAID | $10.00/M |
| | SOURCE | $10.00/M |
| Ranger Rick is a magazine for children ages 7-12. Published 10 times a year. | STATE, SCF, ZIP | $10.00/M |
| | ADDRESSING | |
| Ranger Rick Jr. is a magazine for children ages 4-7. Published 10 times a year. | KEY CODING | $2.00/M |
| | EMAIL | $59.00/F |
| | FTP | $59.00/F |
| Ranger Rick Cub is a magazine for children ages 0-4. Published 6 times per year. | RELATED LISTS | |
| | ⊟ PARENTS MAGAZINE | |
| | ⊟ HEARTHSONG | |
| | ⊟ HIGHLIGHTS® "MAGAZINE" MASTERFILE | |
| | ⊟ YOUNG EXPLORERS | |
| | ⊟ EARLY MOMENTS BOOK CLUB MASTERFILE | |
| Ranger Rick masterfile SUBSCRIBER names are provided TITLE SLUGGED only, "To the ____ Family". GIFT GIVER names are provided TITLE SLUGGED AND FIRST NAME/LAST NAME. | ⊟ SMITHSONIAN MAGAZINE | |
| | ⊟ RANGER RICK SUBSCRIBERS | |
| | ⊟ HIGHLIGHTS® FAMILY MASTERFILE | |
| | ⊟ NATIONAL WILDLIFE FEDERATION MEMBER DONORS | |
| | ⊟ ONE STEP AHEAD CATALOG | |

*See* **Exhibit A** hereto. The same or substantially similar "data card" as the one shown above, with the same rates and the same advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by NWF as far back as the beginning of 2015 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that NWF was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading

Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.

**ANSWER:**  **The allegations in Paragraph 2 of the FAC contain legal conclusions, to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations in Paragraph 2 of the FAC. NWF denies any remaining allegations contained in Paragraph 2.**

3.     Indeed, during the relevant pre-July 31, 2016 time period, NextMark also offered to provide renters access to the mailing list titled "Ranger Rick Marketing Genetics Masterfile", which contains the Private Reading Information of all 753,350 of NWF's then-active and recently expired U.S. subscribers at a base price of $105.00/M [per thousand]," (i.e. 10.5 cents apiece).

**ANSWER:**  **NWF denies the allegations contained in Paragraph 3 of the FAC.**

4.     As a result of NWF's practices of disclosing their Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes following their purchases of subscriptions to NWF's publications over the same time period.

**ANSWER:**  **NWF denies the allegations in Paragraph 4 of the FAC.**

5.     By renting, exchanging, or otherwise disclosing the Private Reading Information of its entire database its Michigan-based subscribers during the relevant

pre-July 31, 2016 time period, NWF violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

**ANSWER:** **The allegations contained in Paragraph 5 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF refers the Court to the Michigan Preservation of Personal Privacy Act ("PPPA"), M.C.L. § 445.1711, et seq., and the 2016 amendment thereto, S.B. 490, 98th Leg., Reg. Sess. P.A. No. 92 (Mich. 2016) for a complete and accurate statement of its contents. NWF denies the remaining allegations contained in Paragraph 5.**

6.    Accordingly, Plaintiff brings this First Amended Class Action Complaint against NWF for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

**ANSWER:** **NWF admits that Plaintiff purports to bring this FAC against NWF as a putative class action, but denies that the claims alleged can properly proceed as a class action and denies that Plaintiff or any putative class member**

has any claim against NWF. NWF denies any remaining allegations contained in Paragraph 6 of the FAC.

## NATURE OF THE CASE

7.     To supplement its revenues, NWF rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as age, child's age, ethnicity, gender, homeowner status, and income—to data aggregators, data appenders, data cooperatives, and other third parties, on a monthly basis, without the written consent of its customers. NWF continuously engaged in these same practices since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period.

**ANSWER:  NWF denies the allegations contained in Paragraph 7 of the FAC.**

8.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, NWF is able to disclose the information time and time again to countless third parties.

**ANSWER:  NWF denies the allegations contained in Paragraph 8 of the FAC.**

9.     NWF's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particular members of society. For example, anyone could buy a

customer list provided by NWF that contains the names and addresses of all Asian women in Michigan over the age of 30 who have a child between the ages of 7 and 10, earn an annual income of greater than $80,000, own their home, and subscribe to *Ranger Rick* magazine. Such a list is available for sale on the open market for approximately $180.00 per thousand subscribers listed.

**ANSWER:** **NWF denies any remaining allegations contained in Paragraph 9.**

10. While NWF profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because NWF does not obtain its customers' written consent prior to disclosing their Private Reading Information.

**ANSWER:** **NWF denies the allegations contained in Paragraph 10 of the FAC.**

**PARTIES**

11. Plaintiff is a natural person and a citizen and resident of the State of Michigan. Plaintiff was a subscriber to *Ranger Rick* magazine, including prior to July 31, 2016. *Ranger Rick* magazine is published by NWF. While residing in, a citizen of, and present in Michigan, Plaintiff's subscription to *Ranger Rick* magazine was purchased directly from NWF. Prior to and at the time Plaintiff subscribed to *Ranger Rick*, NWF did not notify Plaintiff that it discloses the Private Reading Information of its customers, and Plaintiff has never authorized NWF to do so.

7

Furthermore, Plaintiff was never provided any written notice that NWF rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. Since subscribing to *Ranger Rick*, and during the relevant pre-July 31, 2016 time period, NWF disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files. Moreover, during that same period, NWF rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact NWF subscribers, without first obtaining the requisite written consent from Plaintiff or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER:  NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 11 of the FAC and denies them on that basis. NWF denies that Plaintiff was a subscriber to *Ranger Rick*, including prior to July 31, 2016. NWF admits that it publishes *Ranger Rick* magazine. Any remaining allegations state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 11 of the FAC. NWF denies the remaining allegations contained in Paragraph 11 of the FAC.**

12.     Defendant National Wildlife Federation is a Washington, D.C. corporation with its headquarters and principal place of business in Reston, Virginia. NWF does business throughout Michigan and the entire United States. NWF is the publisher of *National Wildlife*, *Zoobooks*, *Zootles*, *Ranger Rick Dinosaurs*, *Ranger Rick Cub*, and *Ranger Rick Jr.* magazines, as well as its flagship publication *Ranger Rick* magazine.

**ANSWER:  NWF admits the first sentence of Paragraph 12 of the FAC.  NWF admits it does business in Michigan and denies the remaining allegations in the second sentence of Paragraph 12 of the FAC. NWF admits that at certain points in time, it published the magazines identified in Paragraph 12 of the FAC, but denies that it published *Zoobooks*, *Zootles*, or *Ranger Rick Dinosaurs* in 2016. NWF denies that it currently publishes *Zootles*. NWF denies any remaining allegations of Paragraph 12 of the FAC.**

### JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

**ANSWER: The allegations contained in Paragraph 13 of the FAC state legal conclusions to which no response is required. To the extent a response is**

required, NWF denies that this action satisfies the requirements of 28 U.S.C. § 1332(d) and/or the Class Action Fairness Act, and denies any remaining allegations contained in Paragraph 13 of the FAC.

14.    The Court has personal jurisdiction over NWF because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Ranger Rick* subscription in Michigan, NWF's direction of such *Ranger Rick* subscription into Michigan, and NWF's failure to obtain Plaintiff's written consent in Michigan prior to disclosing her Private Reading Information, including her residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over NWF in Michigan because NWF conducts substantial business within Michigan, such that NWF has significant, continuous, and pervasive contacts with the State of Michigan.

**ANSWER:  The allegations contained in Paragraph 14 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 14 of the FAC. NWF denies any remaining allegations contained in Paragraph 14.**

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, NWF does substantial business in this

judicial District, NWF is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

**ANSWER:  NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning plaintiff contained in Paragraph 15 of the FAC and denies them on that basis. NWF admits that it does business in Michigan. The remaining allegations contained in Paragraph 15 of the FAC state legal conclusions, to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 15 of the FAC. NWF denies any remaining allegations contained in Paragraph 15 of the FAC.**

## FACTUAL BACKGROUND

16.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

**ANSWER:  NWF refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 16 of the FAC.**

17.   Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

**ANSWER:  NWF refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 17 of the FAC.**

18.   Subsection 2 of the PPPA states:
> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

**ANSWER:  NWF admits that the allegations contained in Paragraph 18 of the FAC contain an excerpt from a section of the PPPA, but denies that it is the complete text of the statute. NWF denies any remaining allegations contained in Paragraph 18 of the FAC.**

19.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100-599, at 6 (Statement of Rep. McCandless).

**ANSWER:   NWF refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 19 of the FAC.**

20.    As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

**ANSWER:   NWF refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 20 of the FAC.**

21.    Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our

13

interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

**ANSWER**:  **NWF refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 21 of the FAC.**

22.    Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

**ANSWER**:  **NWF refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 22 of the FAC.**

23.    Despite the fact that thousands of Michigan residents subscribe to NWF's publications, NWF disregarded its legal responsibility by systematically violating the PPPA.

**ANSWER**: **NWF denies the allegations contained in Paragraph 23 of the FAC.**

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 24 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF denies any remaining allegations contained in Paragraph 24 of the FAC.**

25.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 25 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge and information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 25 of the FAC and denies them on that basis.**

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 26 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 26 of the FAC and denies them on that basis.**

27.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 27 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 27 of the FAC and denies them on that basis.**

28.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like

your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 28 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 28 of the FAC and denies them on that basis.**

29.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 29 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 29 of the FAC and denies them on that basis.**

30.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 30 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the FAC and denies them on that basis.**

31.    In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 31 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the FAC and denies them on that basis.**

32.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like NWF share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the

"[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.

**ANSWER:  NWF denies the allegations contained in Paragraph 32 of the FAC regarding its actions and the effect of such actions. NWF refers to the cited document in the footnote accompanying Paragraph 32 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge and information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 32 of the FAC and denies them on that basis.**

33.    Information disclosures like those made by NWF are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide." The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers." Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

**ANSWER:   NWF denies the allegations contained in the first sentence of Paragraph 33 of the FAC. NWF refers to the cited document in the footnote**

**accompanying Paragraph 33 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 33 of the FAC and denies them on that basis.**

34.    Thus, information disclosures like NWF's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 34 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 34 and denies them on that basis.**

35.    NWF is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

**ANSWER: NWF denies the allegations contained in Paragraph 35 of the FAC.**

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

**ANSWER:  NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 of the FAC and denies them on that basis.**

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

**ANSWER:  NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the FAC and denies them on that basis.**

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online. As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 38 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge**

21

**or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 and denies them on that basis.**

39.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

**ANSWER:  NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 of the FAC and denies them on that basis.**

40.    In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 40 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 of the FAC and denies them on that basis.**

41.    These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the

economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.

**ANSWER:  NWF refers to the cited document in the footnote accompanying Paragraph 41 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. NWF lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41 of the FAC and denies them on that basis.**

42.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.

**ANSWER:  NWF lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 of the FAC and denies them on that basis.**

43.    NWF maintains a vast digital database comprised of its customers' Private Reading Information. NWF discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each NWF customer, including his or her age, child's age, ethnicity, gender, homeowner status, and income. (*See, e.g.*, **Exhibit A**).

**ANSWER:   NWF admits that a database exists that contains certain information. NWF denies any remaining allegations in Paragraph 43 of the FAC.**

44.    NWF then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

**ANSWER:  The allegations contained in Paragraph 44 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 44 of the FAC. NWF denies any remaining allegations in Paragraph 44 of the FAC.**

45.    NWF also discloses its customers' Private Reading Information to data cooperatives, who in turn give NWF access to their own mailing list databases.

**ANSWER:  The allegations contained in Paragraph 45 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in**

Paragraph 45 of the FAC. NWF denies any remaining allegations in Paragraph 45 of the FAC.

46.　　As a result of NWF's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from NWF that identify NWF's customers by their most intimate details such as their age, child's age, ethnicity, gender, homeowner status, and income. NWF's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

**ANSWER: NWF denies the allegations contained in Paragraph 46 of the FAC.**

47.　　NWF does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

**ANSWER: NWF denies the allegations contained in Paragraph 47 of the FAC.**

48.　　Consumers can sign up for subscriptions to NWF's publications through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, NWF never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, NWF uniformly

failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

**ANSWER:  NWF admits that there are various ways and outlets through which an individual may purchase an NWF publication. NWF denies the remaining allegations contained in Paragraph 48 of the FAC.**

49.    As a result, NWF disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"—to anybody willing to pay for it.

**ANSWER:  NWF denies the allegations contained in Paragraph 49 of the FAC.**

50.    By and through these actions, NWF has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

**ANSWER:  NWF denies the allegations contained in Paragraph 50 of the FAC.**

<u>**CLASS ACTION ALLEGATIONS**</u>

51.    Plaintiffs seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by NWF without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

**ANSWER:  NWF admits that Plaintiff purports to bring this action as a class action on behalf of the alleged putative class, but NWF denies that a class can be certified in this case. The allegations contained in Paragraph 51 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 51 of the FAC.**

52.    Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

**ANSWER:  The allegations contained in Paragraph 52 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 52 of the FAC.**

53.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether NWF is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether NWF obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading

Information; and (c) whether NWF's disclosure of Plaintiff's and the Class's Private Reading Information violated the PPPA.

**ANSWER:  The allegations contained in Paragraph 53 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 53 of the FAC.**

54.    The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading Information.

**ANSWER:  The allegations contained in Paragraph 54 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 54 of the FAC.**

55.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

**ANSWER:  The allegations contained in Paragraph 55 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 55 of the FAC.**

56.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER:  The allegations contained in Paragraph 56 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 56 of the FAC.**

## CAUSE OF ACTION

### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

57.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:  NWF incorporates its responses to Paragraphs 1-56 as if fully set forth herein.**

58.    Plaintiff brings this claim individually and on behalf of members of the Class against Defendant NWF.

**ANSWER:  NWF admits that Plaintiff purports to bring this claim in a putative class action lawsuit against NWF, but denies that any individual or class-wide relief is appropriate and denies the remaining allegations contained in Paragraph 58 of the FAC.**

59.    As a magazine publisher that sells subscriptions to consumers, NWF is engaged in the business of selling written materials at retail. *See* PPPA § 2.

**ANSWER:  NWF refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 59 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 59 of the FAC state legal conclusions to which no response is required. To the extent that a response is required, NWF denies the allegations contained in Paragraph 59 of the FAC.**

30

60.    By purchasing a subscription to *Ranger Rick* magazine, Plaintiff purchased written materials directly from NWF. *See* PPPA § 2.

**ANSWER:  NWF refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 60 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 60 of the FAC state legal conclusions to which no response is required. To the extent that a response is required, NWF denies the allegations contained in Paragraph 60 of the FAC.**

61.    Because Plaintiff purchased written materials directly from NWF, Plaintiff is a "customer" within the meaning of the PPPA. *See* PPPA § 2.

**ANSWER:  NWF refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 61 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 61 of the FAC state legal conclusions to which no response is required. To the extent that a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 61 of the FAC. NWF denies any remaining allegations in Paragraph 61 of the FAC.**

62.    At various times during the pre-July 31, 2016 time period, NWF disclosed Plaintiff's Private Reading Information, which identified her as a *Ranger Rick* customer, in at least three ways.

**ANSWER:  The allegations contained in Paragraph 62 of the FAC state legal conclusions to which no response is required. To the extent that a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 62 of the FAC. NWF denies any remaining allegations in Paragraph 62 of the FAC.**

63.     First, NWF disclosed mailing lists containing Plaintiff Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to NWF.

**ANSWER:  The allegations contained in Paragraph 63 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 63 of the FAC. NWF denies any remaining allegations in Paragraph 63 of the FAC.**

64.     Second, NWF disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave NWF access to their own mailing list databases.

**ANSWER:  The allegations contained in Paragraph 64 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in**

Paragraph 64 of the FAC. NWF denies any remaining allegations in Paragraph 64 of the FAC.

65.   Third, NWF rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

**ANSWER:  The allegations contained in Paragraph 65 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF denies the allegations contained in Paragraph 65 of the FAC. NWF denies any remaining allegations in Paragraph 65 of the FAC.**

66.   Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and NWF was able to increase its profits gained from the mailing list rentals and/or exchanges.

**ANSWER:  NWF denies the allegations contained in Paragraph 66 of the FAC.**

67.   By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, NWF disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from NWF. *See* PPPA § 2.

**ANSWER:  NWF refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 67 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 67 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 67 of the FAC.**

68.     The information NWF disclosed indicates Plaintiff's name and address, among other personal and identifying information as reflected in the Nextmark data card shown above, as well as the fact that she purchased a subscription to *Ranger Rick*. Accordingly, the records or information disclosed by NWF indicated Plaintiff's identity. *See* PPPA § 2.

**ANSWER:  NWF refers to the PPPA and the referenced data card for their complete contents and denies any allegations or characterizations contained in Paragraph 68 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 68 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 68 of the FAC.**

69.     Plaintiff and the members of the Class never consented to NWF disclosing their Private Reading Information to anyone.

**ANSWER:  The allegations contained in Paragraph 69 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 69 of the FAC.**

70.    Worse yet, Plaintiff and the members of the Class did not receive notice before NWF disclosed their Private Reading Information to third parties.

**ANSWER:  The allegations contained in Paragraph 70 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 70 of the FAC.**

71.    NWF's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

**ANSWER:  The allegations contained in Paragraph 71 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF states that the allegations in the FAC do not appear to pertain to disclosures pursuant to a court order, search warrant, or grand jury subpoena. NWF denies that it has disclosed information in violation of the PPPA, and denies any remaining allegations contained in Paragraph 71 of the FAC.**

72.    NWF's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

**ANSWER:   The allegations contained in Paragraph 72 of the FAC state legal conclusions to which no response is required. To the extent a response is required to those legal conclusions, NWF states that the allegations in the FAC do not appear to pertain to disclosures made to collect payment for subscriptions. NWF denies that it has disclosed information in violation of the PPPA, and denies the remaining allegations contained in Paragraph 72 of the FAC.**

73.    NWF's disclosures of Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase NWF's revenue. Accordingly, NWF's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

**ANSWER:   The allegations contained in Paragraph 73 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 73 of the FAC.**

74. By disclosing Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, NWF violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

**ANSWER:  NWF refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 74 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 74 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 74.**

75. As a result of NWF's unlawful disclosure of their Private Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA). On behalf of herself and the Class, Plaintiff seeks: (1) $5,000.00 per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

**ANSWER:   NWF refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 75 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 75 of the FAC state legal conclusions to which no response is required. To the extent a response is required, NWF denies the allegations contained in Paragraph 75.**

## NWF's DEFENSES

NWF asserts the following affirmative and other defenses to Plaintiff's FAC:

## FIRST DEFENSE

Plaintiff's and/or other alleged putative class members' information was not disclosed in violation of the PPPA.

## SECOND DEFENSE

Plaintiff's and/or other alleged putative class members have not been harmed, have incurred no cognizable damages, and have not suffered an injury-in-fact traceable to NWF and, therefore, lack standing.

## THIRD DEFENSE

Any complained of disclosures of the Plaintiff's and/or other alleged putative class members' information meet the PPPA's marketing exception contained in M.C.L. § 455.1713.

## FOURTH DEFENSE

Plaintiff and/or alleged putative class members consented to the complained of disclosures pursuant to M.C.L. § 455.1713.

## FIFTH DEFENSE

Plaintiff and/or alleged putative class members provided written permission for the complained of disclosures pursuant to M.C.L. § 455.1713.

**SIXTH DEFENSE**

The PPPA is inapplicable to the complained of disclosures to the extent that the Plaintiff's and/or other members of the putative class's magazine subscriptions were not sold or purchased "at retail" pursuant to M.C.L. § 455.1712.

**SEVENTH DEFENSE**

NWF is a 501(c)(3) non-profit, which is not engaged in the business of selling written materials at retail.

**EIGHTH DEFENSE**

Any complained of disclosures of the Plaintiff's and/or other alleged putative class members' information were and are permissible under the PPPA. M.C.L. § 455.1712.

**NINTH DEFENSE**

To the extent Plaintiff and other putative class members voluntarily disclosed their Private Reading Information and/or consented to the disclosure of such information, their claims are barred in whole or in part by the doctrines of consent, waiver, estoppel, laches, unclean hands, and/or other equitable doctrines.

**TENTH DEFENSE**

Plaintiff's and/or other alleged putative class members' claims are barred, in whole or in part, by the applicable statute of limitations and/or statute of repose.

**ELEVENTH DEFENSE**

Plaintiff's and/or other alleged putative class members have failed to state a claim upon which relief can be granted under the PPPA.

**TWELFTH DEFENSE**

Plaintiff's and/or other alleged putative class members lack statutory standing under the PPPA to assert the claims in the FAC and to seek some and/or all of the relief requested.

**THIRTEENTH DEFENSE**

Plaintiff's and/or other alleged putative class members' claims for alleged statutory damages without proof of any actual damages is unconstitutionally excessive, and barred by the Fifth and/or Eighth Amendments to the United States Constitution and Article I, Section 16 and 17 of the Michigan Constitution, and violates substantive and procedural due process.

**FOURTEENTH DEFENSE**

Both on its face and as sought to be applied by Plaintiff, the PPPA is unconstitutional under the First Amendment to the United States Constitution and Article I, Section 5 of the Michigan Constitution.

**FIFTEENTH DEFENSE**

Awarding Plaintiff's and/or other alleged putative class members the relief sought in the FAC would violate NWF's rights to due process of law under the United States Constitution.

**SIXTEENTH DEFENSE**

This action cannot properly be brought as a class action because the requirements of Fed. R. Civ. P. 23 for certification of a class are not met and cannot be met in this action.

**SEVENTEENTH DEFENSE**

The putative class is not entitled to a tolling of the statute of limitations.

**EIGHTEENTH DEFENSE**

Plaintiff's claims and those of the putative class are barred to the extent they cannot prove a disclosure of their Private Reading Information during a very narrow timeframe of May 30, 2016-July 30, 2016.

**NINETEENTH DEFENSE**

The aggregation of statutory damages for a certified class is unconstitutional, oppressive and contrary to the intent of the PPPA, which was only intended to be brought in individual actions.

## TWENTIETH DEFENSE

This Court lacks requisite jurisdiction to hear Plaintiff's claims pursuant to Michigan Court Rule 3.501(A)(5).

## TWENTY-FIRST DEFENSE

This Court lacks subject matter jurisdiction pursuant to Class Action Fairness Act. 28 U.S.C. § 1332(d).

## TWENTY-SECOND DEFENSE

The FAC contains insufficient information to permit NWF to raise all appropriate defenses and, therefore, NWF reserves its right to amend and/or supplement this answer and these defenses and to assert additional defenses.

**WHEREFORE**, National Wildlife Federation respectfully requests that this Court enter judgment in its favor and against Plaintiff on her First Amended Complaint, award NWF its costs, and enter such other relief as this Court deems necessary and proper.

Dated: May 31, 2023                     Respectfully submitted,

                                        /s/ *Kristen C. Rodriguez*
                                        Kristen C. Rodriguez
                                        Deborah H. Renner
                                        DENTONS US LLP
                                        1221 Avenue of the Americas
                                        New York, New York 10020
                                        (212) 768-6700
                                        kristen.rodriguez@dentons.com

deborah.renner@dentons.com

Peter B. Kupelian (P31812)
Carol G. Schley (P51301)
CLARK HILL PLC
151 South Old Woodward Ave., Suite 200
Birmingham, MI 48009
(248) 530-6336
pkupelian@clarkhill.com
cschley@clarkhill.com

*Counsel for Defendant*
*National Wildlife Federation*

## <u>Certificate of Service</u>

I hereby certify that on May 31, 2023, a copy of the foregoing document was filed electronically and served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ *Kristen C. Rodriguez*
Kristen C. Rodriguez